(No. 85-CC-0323—)

TOM A. EUDALEY and TIM W. EUDALEY, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 10, 1995.*

HEILIGENSTEIN & BADGLEY (THOMAS HEILIGEN-STEIN, of counsel), for Claimants.

JIM RYAN, Attorney General (CLAIRE E. TAYLOR, Assistant Attorney General, of counsel), for Respondent.

## OPINION

MITCHELL, J.

Claimants, Tom A. Eudaley and Tim W. Eudaley, seek damages from Respondent, State of Illinois, for personal injuries sustained by each in a motorcycle accident

which occurred on May 16, 1984, in the eastbound lane of Interstate 70 at the 16.5 mile marker.

Tom Eudaley was operating his motorcycle in an easterly direction on I-70 with his brother, Tim, as a passenger. He was traveling in the median lane. The motorcycle struck a hole, and went out of control, causing the Claimants to be thrown to the pavement. Claimants were injured and received medical treatment. The motorcycle was destroyed.

Tom Eudaley contended that on the date in question, he and his brother had been visiting his sister in St. Louis and were returning home. Traffic was heavy and the motorcycle was being operated in the passing or median lane. Tom was operating the motorcycle at 55 m.p.h. Tom noticed that the truck ahead of him had picked up dust and Tom noticed the flash of the truck's brake lights. Tom thought the truck had a blowout because he saw the smoke and "stuff." The motorcycle struck a hole in the pavement with a lot of chunks of concrete laying around.

Claimant, Tim Eudaley, contended that he saw the truck and white smoke. Tim thought a tire had blown and "didn't know what it was." Tim claimed that when the motorcycle hit the hole, he was thrown off the bike. After the accident, Tim looked back at the hole and was shocked to see how deep "one part of it was." He testified that a big chunk of concrete was gone, and that the hole was a good eight inches deep all the way down to the iron bar. Tim saw the iron bar. He also stated that he had operated a car eastbound on I-70 a week earlier and had not seen the hole.

Trooper Ellis investigated the accident. He observed the hole in the pavement being approximately 5 feet by 5

feet and 10 inches deep. The motorcycle received extensive damage. Ellis saw rocks, pebbles and asphalt lying around the hole, but not large chunks of concrete. Ellis reported the pavement damage to the Department of Transportation. Ellis stated that the hole was located in the passing lane. The motorcycle was 450 feet away from the hole.

Phillip Schneider, a Department of Transportation employee with the bureau of maintenance, maintained that he acquired knowledge of this accident on the following day or the day after in the course of his discussion with his immediate supervisor, field engineer Ponce. Ponce told Schneider that there was a pavement blow-up. Emergency repairs had been made on the evening of the 16th and permanent repair of the site was made a couple of weeks later. Schneider recounted that work crews are sent to that stretch of Interstate 70 "one or two times in the year, if then," but there had been ongoing repairs done on that stretch of Interstate 70 during the spring of the year when the accident occurred. At the time of the accident, routine repairs were going on in the general vicinity of this accident "a couple of miles east in that area." Schneider traveled this portion of I-70 during the times that repairs were being made. He related that based upon the description of the hole, he would have noticed it. If he had heard of such a hole, an immediate response to repair it would have been made. Schneider traveled I-70 in that area two or three times a week during the spring of the year.

J. Robert Ponce, a maintenance field engineer with the Department of Transportation, recounted that he was working on the day of the accident. He was called at home by a Department of Transportation radio dispatcher who advised him of the pavement problem at

mile marker 16 that needed attention. Ponce called a foreman to go and make whatever repairs were necessary. A "blow up" is a buckling or a traumatic occurrence of the pavement which usually happens in the warm time of the year, summer or spring months. This condition occurs from heat and moisture causing stress on the pavement which causes it to raise up or blow out. Ponce stated that the Department of Transportation can, in some seasons or some summers, "account for maybe 20 of these." A need study is the only formal procedure for inspecting the roadways other than normal traveling to and from different locations for road business. Ponce's opinion that this was a "blow up" was based on what the repair crew told him and his observations of the area where he observed a "slight hump" and "the heavy part of it." The hump referred to by Ponce was approximately 2-3 inches higher than the normal elevation of the pavement and spread out over an area of 3-4 feet wide. Ponce reported that there is no way to predict where a concrete blow up will occur. Blow ups have occurred at temperatures around 70 degrees. The concrete at the location in question was of a type known as continuously reinforced concrete pavement that has heavy reinforcing steel through the center of it which takes up expansion and contraction. Ponce stated that it was his experience that there are fewer blow ups on this type of pavement than on the type of pavement with expansion joints.

Harry E. O'Connell stated that he was an eyewitness to the accident in question. In his travels to and from work, Mr. O'Connell travels Interstate 70 at the location of the accident returning from work each day, and was traveling that same route on the day of the occurrence. O'Connell was in the driving lane and there was an 18-wheeler and two or three cars behind it, and then the two

boys on the motorcycle. O'Connell guessed he was about a quarter of a mile behind the truck. He guessed that the truck hit the bad spot in the pavement and threw up a white powder or dust. O'Connell thought he had dropped a sack of flour. O'Connell then saw a concrete piece rolling under the truck's wheels, and that the pavement had been torn up. O'Connell stated that he knew that the boys on the motorcycle could not see that because their vision was restricted by the truck and by the two cars following the truck. O'Connell saw the accident coming and knew what was going to happen. When the boys on the motorcycle hit the spot in the road, they started fish-tailing on the road and lost control. The truck had caused pieces of concrete to roll under its wheels. O'Connell described the hole as being half the size of a table to a full-size table. He stated that the chunks of concrete may have rolled off to the shoulder, but he could not remember. O'Connell believed that particular stretch of I-70 was "terrible" and that it seemed like the area was always subject to potholes and busted up pavement, but on his previous trips he did not recall seeing anything in the same area where the accident occurred that would appear to be similar to what he saw the evening after the accident.

The issue is whether or not Respondent, State of Illinois, had actual or constructive notice that a hazardous condition existed in the median lane eastbound I-70 at the 16.5 mile marker. The State owes a duty to all users of the highways to maintain them in a reasonably safe condition. (*Berry v. State* (1968), 26 Ill. Ct. Cl. 377.) Claimants must show that the State had actual or constructive notice of a defect in order to recover on a negligent highway maintenance claim. *Piggott v. State* (1968), 26 Ill. Ct. Cl. 262.

Respondent contests the existence of either actual or constructive notice. This Court has consistently held that each case involving constructive notice must be decided on its own particular facts. (*Bugle v. State* (1967), 26 Ill. Ct. Cl. 173.) In *Wagner v. Illinois* (1978), 32 Ill. Ct. Cl. 50, this Court denied recovery where the decedent lost control of his motorcycle on account of loose gravel on an interstate highway ramp. This Court found no evidence of actual notice in the testimony. Knowing that the State may be charged with constructive notice where, through the exercise of due diligence, a condition should have been discovered, this Court found that there was no evidence on how long the gravel had been lying on the pavement, and thus, no constructive notice. In the instant case, there was no testimony that the hole or the buckling of the highway was seen at any time before the day of the accident. State employees had routinely observed the section of highway in question. No hole or buckling was seen. After receiving actual notice of the condition as a result of the accident, the State made temporary repairs to the highway immediately.

There is no evidence in this record to indicate that the Respondent, in the exercise of reasonable care and diligence, should have known of the condition which caused the accident. This Court cannot conclude that the defect in this case existed for a sufficient period of time to be discovered by the State.

Wherefore, it is hereby ordered that this claim is denied.